**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
Abingdon Division

|  |  |  |
|---|---|---|
| JAEON CHAVIS, | ) | **CLERKS OFFICE US DISTRICT COURT**<br>**AT ABINGDON, VA**<br>**FILED** |
| *Plaintiff,* | ) | April 20, 2026 |
| | ) | **LAURA A. AUSTIN, CLERK** |
| v. | ) | **BY: /s/ Robin Bordwine** |
| | ) | **DEPUTY CLERK** |
| RICK WHITE, in his individual capacity; | ) | |
| MATTHEW BERNOCCO in his individual capacity; | ) | |
| JORDAN MURRAY, in his individual and official capacity; | ) | Civil Action No. 1:25-cv-14 |
| ALFRED YATES, in his individual and official capacity; | ) | **JURY TRIAL DEMANDED** |
| DUSTIN W. HOLLAND, in his individual and official capacity; | ) | |
| AARON CORNETT, in his individual and official capacity; | ) | |
| TANNER STUMPF, in his individual and official capacity; | ) | |
| COREY BOWER, in his individual and official capacity; | ) | |
| SETH BURKE, in his individual and official capacity; | ) | |
| and BENJAMIN WHITT, in his individual and official capacity, | ) | |
| *Defendants.* | ) | |

**SECOND AMENDED COMPLAINT**

## I. INTRODUCTION

What should have been a simple request for help with a phone call became a desperate plea by Jaeon Chavis ("Mr. Chavis") for his life. Red Onion corrections officers crushed, punched, pepper sprayed, and nearly suffocated Mr. Chavis, all culminating in an officer ordering a canine to attack him. They demeaned him, calling him a "nigger" and a "fucking nigger crybaby." They tortured him — all for trying to call his daughter on her birthday.

The violent assault began when three officers piled onto his back — their combined weight crushing him as their knees dug deep into his ribs and neck. When Mr. Chavis told the officers he could not breathe, the officers escalated their attack by beating him and pepper spraying his eyes and face. Another officer ordered a canine to attack. The canine viciously tore into Mr. Chavis' leg. Finally, once Mr. Chavis' leg had been ravaged and the pepper spray had ceased, the canine detached its teeth — Mr. Chavis watched as large chunks of his flesh fell to the ground.

What followed was a series of further indignities: officers prolonged Mr. Chavis' suffering by arguing with medical staff about his need for emergency care, subjected him to multiple obscene and demeaning searches, and taunted him — mocking his pain, calling him racial slurs, and threatening him with further violence.

Mr. Chavis now brings this action to hold the officers and their supervisors accountable for violating his right to be free from excessive force under the Eighth Amendment, for their assault, battery, negligence, and intentional infliction of emotional distress under the laws of the Commonwealth of Virginia, and for retaliation under the First Amendment.

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3), as this action asserts claims arising under the United States Constitution and federal civil rights laws of the United States.

2. This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the claims within the original jurisdiction of this Court that they form part of the same case.

3. Venue is proper under 28 U.S.C. § 1391(b)(1) because one or more of the Defendants is subject to the Court's personal jurisdiction and under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred in Wise County.

## III. PARTIES

### A. Plaintiff

4. Plaintiff Jaeon Chavis ("Mr. Chavis") is a 37-year-old Black man and father of three. At all times relevant to the events alleged in this Complaint he was a citizen of the Commonwealth of Virginia.

5. During the relevant time period, Mr. Chavis was incarcerated at Red Onion State Prison ("Red Onion").

6. In August 2024, Mr. Chavis was transferred to Wallens Ridge State Prison ("Wallens Ridge").

7. Both prisons are operated by the Virginia Department of Corrections ("VDOC").

### B. Defendants

8. Defendant Rick White was the facility unit head ("Warden") of Red Onion on July 23, 2023. Upon information and belief, Defendant White had been the Warden of Red Onion since at least 2021. Defendant White is now the Warden of Indian Creek Correctional

3

Center in Chesapeake, Virginia. While he was Warden, Defendant White was responsible for the operation and maintenance of Red Onion and the supervision, training, and discipline. of correctional officers.

9.      Defendant Matthew Bernocco was the Statewide Canine Program Coordinator in VDOC on July 23, 2023. Upon information and belief, Defendant Bernocco had been Canine Program Coordinator since at least 2021. As Canine Program Coordinator, Bernocco was responsible for the development of canine procedures and standards, as well as supervising, training, and disciplining canine units.

10.      Defendants Jordan Murray, Alfred Yates, and Dustin W. Holland (collectively, "Defendant Altercation Officers") are corrections officers at Red Onion, each serving in that capacity on July 23, 2023.

11.      Defendant Aaron Cornett is a corrections sergeant at Red Onion and served in that capacity on July 23, 2023.

12.      Defendant Tanner Stumpf is a corrections officer and member of the Patrol Canine Team at Red Onion, who was serving in that capacity on July 23, 2023.[1]

13.      Defendants Corey Bower, Seth Burke, and Benjamin Whitt (collectively, "Defendant Assisting Officers") are corrections officers at Red Onion, each serving in that capacity, and were present in the A6 Day Pod on July 23, 2023, around the time of the incident that gives rise to these claims.

---

[1] According to VDOC Operating Procedure 435.3, the Patrol Canine Team consists of trained corrections officers and their canines, which are trained to assist in maintaining security, custody, and control of the population of incarcerated people at Red Onion.

14.    At all times material hereto, Defendants Murray, Yates, Holland, Stumpf, Bower, Burke, Whitt, and Cornett (collectively, "Defendant Officers") were acting under the color of state law, pursuant to their authority as officials, agents, contractors, or employees of VDOC.

## IV. FACTUAL ALLEGATIONS

### A. VDOC Facilities Use Canines in a Disproportionate and Racialized Way

15.    From 2017 to 2022, there were 271 canine attacks on incarcerated individuals in VDOC facilities. Nationwide, during the same period, there were twenty-four attacks outside of Virginia.[2]

16.    These bites occur through the use of VDOC's statewide Canine Program, defined by Operating Procedure 435.3, which allows the use of canines to assist officers "in control of inmate population." The policy gives significant deference to allow the canine officer to determine when and how to use their canines to bite incarcerated individuals.[3]

17.    For every one of those bites, the canine officer or another responsible party is required to fill out a Bite Report and send it to, *inter alia*, the Warden and the Canine Program Coordinator, who maintain responsibility over both the Canine Program policies and the individual canine officers. The canine officer must also photograph all bite marks of the person bitten, along with tears in the clothing attributed to the canine.[4]

18.    During his incarceration in Red Onion, and throughout Defendant White's tenure as Warden and Defendant Bernocco's tenure as Canine Program Coordinator, Mr. Chavis

---

[2] Hannah Beckler, *Virginia uses attack dogs in prisons more than any other state. Now lawmakers want to crack down.*, BUSINESS INSIDER (Dec. 26, 2023), https://www.businessinsider.com/legislation-curb-patrol-dogs-in-virginia-prisons-2023-12.
[3] *See* VDOC OP 435.3 (Canine Operations Unit), VXII,D, Dec. 1, 2021. VDOC does not publish all of its operating procedures, including 435.3. Plaintiff obtained a redacted version from VDOC subject to a Virginia Freedom of Information Act request.
[4] *See id.*, XVIII.

observed canine officers disproportionately targeting Black people while hurling racist comments and slurs at their victims. During these incidents, the canine officer often directed their canine to bite incarcerated individuals, even when they were compliant, as a malicious form of punishment and without any apparent safety purpose.

19.     Throughout this time, the Canine Operations Unit and Red Onion did not implement any new policies to regulate the use of patrol canines and protect incarcerated individuals from these frequent canine attacks.

20.     The Statewide Canine Coordinator is responsible for coordinating all canine training.[5] Upon information and belief, Red Onion did not alter its training program to ensure canine officers did not maliciously deploy their patrol canines upon incarcerated individuals acting in compliance with officer instructions as a form of punishment.

21.     Operating Procedure 435.3 provides that "canine officers who do not comply with VDOC operating procedures are subject to disciplinary action . . . [the] Statewide Canine Coordinator [] and the [Warden] can at their discretion remove a Canine Officer from a canine post."[6] Termination of a canine officer is ultimately the Warden's decision. Upon information and belief, Defendants White and Bernocco did not subject any canine officer involved in these canine attacks to disciplinary action or remove them from post.

---

[5] *See id.*, III.A.1.
[6] *See id.*, II.D.

**B. Defendant Officers Brutally Attacked Mr. Chavis on July 23, 2023 While He Posed No Threat and Offered No Resistance**

### 1. *Defendant Altercation Officers Violently Restrained and Choked Mr. Chavis*

22.    At or around 6:00 p.m. on July 23, 2023, Mr. Chavis was let out of his cell and attempted to use a wall phone in the A6 Day Pod ("the Pod") to call his daughter for her birthday.

23.    Mr. Chavis discovered that the phone was not operational.

24.    Mr. Chavis called out to the booth officer on duty, Defendant Holland, for assistance but received no verbal response.

25.    Mr. Chavis asked multiple times for help with the phone. Defendant Holland refused to assist Mr. Chavis, and told him, "I ain't calling nobody. You can go back to the cell if you can't call."

26.    Mr. Chavis insisted that he wanted to speak to a lieutenant or sergeant to help fix the phone. Defendant Holland then ordered Mr. Chavis to "lockdown."[7]

27.    Defendants Murray and Holland then came to the entry of the Pod and demanded that everyone lockdown.

28.    Defendants Murray and Holland called Mr. Chavis and told him to follow them. Mr. Chavis feared that they would lead him alone to a corridor known as the "boulevard" to harm him. Upon information and belief, the boulevard contained a blind spot that the cameras cannot see. Mr. Chavis, aware of previous violent incidents at the "boulevard," told Defendants Murray and Holland, "I'll sit by the phone."

---

[7] According to the Virginia Department of Corrections Emergency Management OP 075.1, a lockdown is defined as "a general confinement, either scheduled or unscheduled, of inmates . . . in assigned quarters and the stoppage of inmate . . . movement and normal activities in all or part of the facility during which time staff normally conduct thorough searches."

29.     Defendant Yates joined Defendants Murray and Holland in the entry of the pod. Followed by Defendants Holland and Murray, Defendant Yates began to approach Mr. Chavis.

30.     Mr. Chavis saw Defendant Stumpf enter the pod and patrol the floor with their canines.

31.     Mr. Chavis then put both hands in the air and asked Defendant Altercation Officers what he had done, and stated, "I surrender. Don't let those dogs bite me."

32.     Defendant Yates instructed Mr. Chavis to turn around and place his hands behind his back.

33.     Mr. Chavis lowered his hands one at a time as directed and again told Defendant Altercation Officers that he surrendered.

34.     Defendant Yates instructed Mr. Chavis not to move. Mr. Chavis complied.

35.     Defendant Yates stood behind Mr. Chavis and handcuffed his left wrist. As Mr. Chavis brought down his right wrist to be handcuffed, Defendant Yates unexpectedly demanded, "stop resisting."

36.     Mr. Chavis looked back at Defendant Yates and responded, "I'm not resisting."

37.     At that moment, Defendant Yates swept Mr. Chavis' legs out from under him. At the same time, Defendant Holland maced Mr. Chavis while Defendant Yates slammed his body to the floor forcing his neck, face, and stomach into the concrete.

38.     Defendant Yates attempted to force Mr. Chavis into a chokehold which lasted more than 15 seconds while Defendants Murray and Holland dug their knees into Mr. Chavis' side and neck while twisting his arms behind his back. Mr. Chavis tucked his chin into his chest and tried to move his head to prevent Defendant Altercation Officers from choking him.

8

39. Defendant Altercation Officers kneeled on top of Mr. Chavis, further restricting his breathing with hundreds of pounds of their combined body weight on his head, back, and neck.

40. Mr. Chavis repeatedly told Defendant Altercation Officers, "I can't breathe."

41. Mr. Chavis believed he was going to die.

### 2. *Additional Officers Needlessly Escalated the Attack, Despite Mr. Chavis Being Confined*

42. At that time, Defendant Stumpf approached Mr. Chavis with his canine.

43. Mr. Chavis begged, "please don't let that dog bite me."

44. Without issuing any prior warning to Mr. Chavis and despite the closer proximity of the other patrol canine officer, Defendant Stumpf ignored Mr. Chavis' pleas and ordered his canine to attack him, yelling, "get him."

45. Mr. Chavis watched in horror as the canine ran toward him and violently attacked him by sinking its teeth into his left leg and ferociously shaking its head from side to side.

46. Mr. Chavis felt as though he was being eaten alive.

47. Mr. Chavis cried out as loud as he could, stating, "y'all are killing me."

48. Defendant Assisting Officers and Defendant Cornett entered the pod. One at a time, each of the Defendant Assisting Officers engaged, placing their weight and further pressure on top of Mr. Chavis in addition to the Defendant Altercation Officers already crushing him.

49. Watching from their cells, some incarcerated individuals yelled out to Defendant Officers, "get off of him."

50. Defendant Altercation Officers, still on top of Mr. Chavis, taunted him with racial slurs and ordered him to "stop resisting." At this point, there were seven officers engaged in oppressing Mr. Chavis, as well as a canine actively tearing into his leg.

9

51.     Defendant Stumpf continued to provoke his canine by uttering phrases like "get him" and "get his ass."

52.     Mr. Chavis saw the canine take a chunk of his leg with it. His flesh fell to the floor.

53.     The gaping wounds left by the canine were as wide as Mr. Chavis' open hand.

54.     Defendant Officers boasted, "we got one" and "we did it again."

55.     Since Mr. Chavis was unable to walk, Defendant Officers lifted Mr. Chavis into a wheelchair after Defendant Stumpf commanded the canine to detach from his leg.

56.     At some point, Defendant Murray bragged, "[we] just fucked up another nigger again tonight."

### 3. Defendant Officers Dragged Mr. Chavis to the Medical Unit While Shouting Racial Slurs at Him and Delayed Him from Receiving Medical Attention

57.     Defendant Officers placed  Mr. Chavis in a wheelchair and wheeled him from the Pod to the medical unit, periodically forcing him to attempt to walk despite his obvious wounds.

58.     Mr. Chavis looked at his leg and thought it looked like ground taco meat. As he was dragged, he left behind a trail of blood and pieces of his detached flesh.

59.     When he finally made it to the medical unit, Defendant Officers delayed Mr. Chavis' treatment by arguing with Nurse Practitioner Lea Holbrook ("Nurse Holbrook") about whether Mr. Chavis should go to the hospital.

60.     The medical staff indicated that this was one of the worst canine bites they had ever seen.

61.     Defendant Cornett insisted that Mr. Chavis did not need medical treatment and instead baselessly accused him of being intoxicated and on drugs.

10

62.    A corrections officer took pictures of Mr. Chavis' wounds for the Canine Bite Report Package.[8]

63.    Upon information and belief, a corrections officer filled out a bite report and sent it to Defendant White and Defendant Bernocco. Upon information and belief, a corrections officer also photographed the bite wounds on Mr. Chavis's legs.

64.    An ambulance was ultimately called to take Mr. Chavis to Ballad Health Norton Community Hospital ("Ballad Health") for treatment.

### 4. *Defendant Officers Unnecessarily Prolonged Mr. Chavis' Suffering by Subjecting Him to a Series of Humiliating and Painful Searches*

65.    Before Mr. Chavis left the prison for Ballad Health, Defendant Officers wheeled him to another room.

66.    Once there, Mr. Chavis saw most Defendant Officers turn off their body cameras.

67.    Defendant Officers forced Mr. Chavis to strip out of his blood-soaked clothes and put on a clean prison uniform without any assistance, making him drag the fabric over his open wounds.

68.    Defendant Officers called Mr. Chavis a "nigger" and a "fucking nigger crybaby," and said, "[we] should have let the dog kill you" and "you keep crying you ain't gonna make it to the hospital."

69.    Mr. Chavis told Defendant Cornett that he intended to file a lawsuit.

70.    Defendant Cornett replied that he would "not be so lucky next time" if he did so.

---

[8] Operating Procedure 435.3, Section XVIII requires VDOC corrections officers to document all instances of canine engagements.

71.     Defendant Officers led Mr. Chavis to the body scanning machine. They then placed him in transport restraints—including metal belly chains, handcuffs, and ankle cuffs—and forced Mr. Chavis to balance on his right leg while in the machine.

72.     Defendant Cornett declared that he saw something inside Mr. Chavis on the scanner's screen, although no other officer commented on seeing anything. Upon information and belief, Defendant Cornett fabricated the need for a second screening in order to prolong Mr. Chavis' suffering.

73.     Mr. Chavis was then taken to a room where he was again forced to painfully remove his clothes without assistance.

74.     Once Mr. Chavis was undressed, Defendant Cornett ordered, "bend over, boy . . . spread your ass. Let me see that ass."

75.     Mr. Chavis attempted to squat, but fell over because he was unable to put weight on his disfigured left leg; he eventually struggled through the pain to do as Defendant Cornett demanded.

76.     No Defendant Officer found any contraband inside of Mr. Chavis.

77.     Mr. Chavis felt humiliated, targeted, and sexually harassed by Defendant Cornett's comments and actions.

78.     Mr. Chavis struggled to get dressed a second time, which required him to balance on his torn-open leg.

79.     Defendant Officers forced Mr. Chavis to go through the body scanner again. Defendant Officers found nothing inside of Mr. Chavis.

80.     As Mr. Chavis was wheeled to the ambulance, Defendant Officers called him a "crybaby" and a "crybaby nigger."

81.    While waiting for the ambulance, a corrections officer threatened Mr. Chavis that if he spoke with anyone about the canine attack he would be considered a snitch and would "be taken care of" upon return.

### 5. *Mr. Chavis' Wounds Continued to Cause Him Excruciating Pain Through the Night and into the Next Morning*

82.    While in the ambulance, one of the EMTs told Mr. Chavis that it was a miracle the canine did not puncture a major artery during the attack.

83.    At the hospital, nurses checked Mr. Chavis' vitals, drug tested him, and sent him for an x-ray. No drugs or alcohol were found in Mr. Chavis' system.

84.    After being discharged from Ballad Health at or around 3:00 a.m. on July 24, 2023, Mr. Chavis was taken back to Red Onion, wheeled to a medical unit cell, and placed in bed.

85.    Mr. Chavis fell asleep and experienced vivid nightmares about the attack.

86.    Upon waking up, he realized that he had urinated and defecated in his sleep. The sheets were soaked with blood from the wounds on his leg.

87.    Nurse Holbrook unwrapped his bandages, examined his leg, and said that the wound was so deep she could "fit almost [her] whole pinkie [finger] in [it]."

### 6. *After Stating His Intent to File a Lawsuit, Mr. Chavis Learned that He Was Subject to Fabricated Disciplinary Charges*

88.    During the night of the incident, Mr. Chavis had affirmatively stated that he intended to file a lawsuit over the actions of Defendant Officers.

89.    On or around July 26, 2023, Mr. Chavis submitted a grievance about the incident in which he stated that he was attacked by Defendant Yates and other Defendant Officers.

90.    On or around July 29, 2023, Defendant Holland approached Mr. Chavis and told him that he did not know why Defendant Stumpf let his canine loose on him, and that the use of

13

the canine and the number of officers who responded was unnecessary because Mr. Chavis had put his hands up.

91.     Defendant Holland also informed Mr. Chavis about a disciplinary charge accusing him of biting Defendant Yates in the leadup to the canine attack.

92.     Mr. Chavis did not bite Defendant Yates at any point during the attack.

93.     Defendant Holland told Mr. Chavis that he knew that he had not bitten Defendant Yates.

94.     Defendant Holland stated that he had viewed the security camera footage of the incident. While he said the footage looked ambiguous, Defendant Holland told Mr. Chavis that he believed Defendant Yates fabricated the charge.

95.     Some time after the conversation with Defendant Holland but before September 26, 2023, Mr. Chavis was subject to a disciplinary hearing that included a charge alleging Mr. Chavis bit Defendant Yates.

96.     Upon information and belief, this charge was based on false accusations Defendant Yates made against Mr. Chavis in response to his stated intent to file a lawsuit.

97.     The hearing officer acknowledged that there was no evidence to support the charge other than Defendant Yates' word at the hearing.

98.     The hearing officer told Mr. Chavis that Defendant Yates' word would be taken over that of Mr. Chavis and, therefore, subjected him to disciplinary action.

99.     On September 26, 2023, Mr. Chavis submitted a grievance stating that Defendant Yates lied at the disciplinary hearing.

14

### 7. Mr. Chavis Lives with Lasting Physical, Mental, and Emotional Injuries from the Attack

100. Mr. Chavis still experiences pain that keeps him up at night as a result of nerve damage from the bite wounds.

101. Mr. Chavis has a limited range of motion and frequently experiences numbness in his left leg, often giving him trouble standing without assistance.

102. Mr. Chavis continues to suffer from Post-Traumatic Stress Disorder ("PTSD"), insomnia, and depression.

103. In the months that followed the attack, Mr. Chavis had nightmares every night and would jolt out of his sleep in a cold sweat if he heard dogs barking or loud slamming noises during the night.

104. While he remained at Red Onion, Mr. Chavis lived in fear each time he saw Defendant Officers that they would attack him again and that he would not survive the next time.

## V. CLAIMS FOR RELIEF

### Claim I: Excessive Force in Violation of the Eighth Amendment
U.S. Const. Amend. VIII; 42 U.S.C. § 1983
*Against Defendant Officers Murray, Yates, Holland, Cornett, Bower, Burke, Whitt, and Stumpf, ,*
*in their individual and official capacities, and Defendants White and Bernocco in their*
*individual capacities*

105. Mr. Chavis adopts and incorporates the foregoing paragraphs as if fully set forth herein.

106. At all times relevant to this case, Defendant Officers acted under color of state law pursuant to their authority as officials or employees of Red Onion.

107. As an incarcerated individual, Mr. Chavis has a constitutional right under the Eighth Amendment to be free from cruel and unusual punishment, including the right to be free from excessive force at the hands of corrections officers.

15

108.     Defendant Altercation Officers violated Mr. Chavis' right to be free from excessive force when they pinned him under their combined body weight while the other Defendant Officers crushed him, punched him, pepper sprayed him, and ordered a canine to attack him, despite Mr. Chavis complying with their orders.

109.     Defendant Altercation Officers' force was objectively more than de minimis as their continuous suffocating and punching of Mr. Chavis was sufficiently serious and likely to cause injury.

110.     Defendant Altercation Officers' actions were not a good-faith effort to protect physical safety or maintain prison order as they could not have reasonably believed that he was a threat to any of the five or more corrections officers or any other incarcerated person. Mr. Chavis had already been restrained, was outnumbered by the officers, and was complying with their orders. Instead, Defendant Altercation Officers' actions were carried out maliciously and sadistically for the sole purpose of causing harm to Mr. Chavis.

111.     Defendant Assisting Officers violated Mr. Chavis' right to be free from excessive force when they punched and crushed him without cause after he was already restrained by Altercation Officers and complying with their orders.

112.     Defendant Assisting Officers's use of force was objectively more than de minimis as crushing, suffocating, and punching Mr. Chavis while he had been restrained was sufficiently serious and likely to cause injury.

113.     Defendant Assisting Officers's actions were not a good-faith effort to protect safety or maintain prison order as they could not have reasonably believed that he posed a threat to any of the five or more corrections officers or any other incarcerated person. Mr. Chavis was already handcuffed, in a chokehold, pinned under the weight of Altercation Officers, and

16

outnumbered when they joined the attack. Instead, Defendant Assisting Officers punched and crushed Mr. Chavis maliciously and sadistically for the sole purpose of causing him harm.

114. Defendant Holland violated Mr. Chavis' right to be free from excessive force when he joined the attack and pepper sprayed Mr. Chavis in his eyes and face without cause.

115. Defendant Holland's use of force was objectively more than de minimis as pepper spraying Mr. Chavis was sufficiently serious and likely to cause injury.

116. Defendant Holland's actions were not a good-faith effort to protect physical safety or maintain prison order as he could not have reasonably believed that he posed a threat to any of the five or more corrections officers or any other incarcerated person. Mr. Chavis was outnumbered, and in the process of being slammed to the ground and placed in a chokehold when Defendant Holland joined the attack. Defendant Holland acted maliciously and sadistically to exacerbate Defendant Officers' force and cause Mr. Chavis additional harm.

117. Defendant Stumpf violated Mr. Chavis' right to be free from excessive force when he ordered his canine to attack Mr. Chavis without cause and failed to separate his canine from Mr. Chavis' leg or temper the severity of its attack, even though Mr. Chavis remained restrained and compliant with Defendant Officers' orders.

118. Defendant Stumpf's use of force was objectively more than de minimis as ordering the canine — whose teeth can bite through sheet metal[9] — to attack Mr. Chavis, and failing to restrain the canine as it violently tore into Mr. Chavis' flesh, was sufficiently serious and caused significant injury.

---

[9] Beckler, *supra* note 2. Upon information and belief, all patrol canine officers are trained to understand the severity of a canine bite and the degree to which it would cause significant bodily injury.

17

119.   Defendant Stumpf's actions were not a good-faith effort to protect physical safety or maintain prison order as he could not have reasonably believed that he posed a threat to any of the five or more corrections officers or any other incarcerated person. Mr. Chavis had already been restrained, was outnumbered by the officers, and was complying with their orders. Instead, Defendant Stumpf acted maliciously and sadistically to exacerbate Defendant Officers' force and cause Mr. Chavis additional harm.

120.   Because of Defendant Officers' needless and excessive use of force in violation of his Eighth Amendment rights, Mr. Chavis has suffered severe and permanent physical injuries and has endured emotional, mental, and psychological pain and suffering.

121.   As Warden of Red Onion, Defendant White was responsible for disciplining and supervising all correctional officers, including canine officers. This included creating and updating policies that protect incarcerated individuals from Excessive Force, training correctional officers at Red Onion to ensure they did not engage in conduct that would harm incarcerated individuals as a form of punishment, and disciplining or terminating correctional officers that violated such policies.

122.   As the Statewide Canine Program Coordinator, Defendant Bernocco was responsible for training, disciplining, and supervising canine officers. This included reviewing and updating Operations Procedure 435.3, ensuring VDOC canine officers were adequately trained to engage with incarcerated individuals in a manner consistent with the right to be free from Excessive Force, disciplining canine officers when they violated VDOC policies regarding the use of canines, and supervising canine officers such that they did not use their canines to harm incarcerated individuals as a form of punishment.

123. Defendants White and Bernocco received a Bite Report for every canine engagement and were responsible for being aware of the systemic prevalence of canine officers at Red Onion directing their canines to attack compliant incarcerated individuals without provocation.

124. Defendants White and Bernocco failed to take actions to protect Mr. Chavis from these attacks. Defendants White and Bernocco failed to change or implement new canine policies, failed to supervise or train canine officers to prevent these attacks, and, upon information and belief, failed to discipline or remove canine officers who had improperly directed their canines to attack compliant incarcerated individuals.

125. Due to Defendants White and Bernocco's failure to supervise, train, and discipline canine officers who directed their canines to attack compliant incarcerated individuals, Defendant Stumpf was free and emboldened to maliciously and sadistically order his canine to attack Mr. Chavis.

### Claim II: Civil Assault
Virginia Common Law
*Against Defendant Officers Murray, Yates, Holland, Cornett, Bower, Burke, Whitt, and Stumpf, in their individual and official capacities*

126. Mr. Chavis adopts and incorporates the above paragraphs as if fully set forth herein.

127. Defendant Altercation Officers intended to cause severe physical injury to Mr. Chavis when they crushed him with their combined body weight and choked, and punched him.

128. Defendant Altercation Officers knew that pinning Mr. Chavis down under their combined body weight, placing him in a chokehold, and punching and crushing him was likely to make Mr. Chavis fear further injury, especially as he repeatedly told them that he could not breathe.

19

129.    Defendant Altercation Officers acted with malice by violently restraining and attacking him without cause, and they had total control and custody over him once he laid handcuffed on the floor. Defendant Altercation Officers also acted with malice by calling Mr. Chavis racial slurs and keeping Mr. Chavis pinned to the ground while other Defendant Officers escalated the attack.

130.    Defendant Assisting Officers intended to cause severe physical injury to Mr. Chavis when they crushed and punched him.

131.    Defendant Assisting Officers caused Mr. Chavis to fear further imminent battery by repeatedly crushing and punching him. Mr. Chavis repeatedly begged them to stop.

132.    Defendant Assisting Officers acted with malice as they attacked Mr. Chavis without cause, since he was already laying face down, handcuffed, and pinned under the weight of Altercation Officers. Defendant Assisting Officers also acted with malice by calling Mr. Chavis racial slurs and taunting him throughout the attack.

133.    Defendant Cornett intended to cause severe physical injury to Mr. Chavis by pepper spraying him directly in his eyes and face.

134.    Defendant Holland caused Mr. Chavis to reasonably fear further imminent battery when he pepper sprayed Mr. Chavis' eyes and face without cause or provocation.

135.    Defendant Holland acted with malice when he joined and escalated the attack on Mr. Chavis.

136.    Defendant Stumpf intended to cause severe physical injury to Mr. Chavis by ordering his canine to bite Mr. Chavis' leg while he was on the ground in a chokehold, pinned under the body weight of Altercation Officers, and complying with their orders.

137. As soon as Mr. Chavis saw and heard Defendant Stumpf's canine, he reasonably feared that he would suffer severe and imminent battery, and begged Defendant Officers to not let the canine bite him. Mr. Chavis' fear of imminent battery only increased as the canine began to viciously tear into his flesh; Mr. Chavis feared that Defendant Officers and Defendant Stumpf's canine would kill him.

138. Defendant Stumpf acted with malice as he repeatedly ordered his canine to continue biting Mr. Chavis with commands of "get him" and "get his ass." Defendant Stumpf did not relent even as Mr. Chavis yelled, "y'all are killing me."

139. As a direct result of Defendant Officers' tortious conduct, Mr. Chavis suffered severe and permanent physical injuries and has endured emotional, mental, and psychological pain and suffering.

### Claim III: Civil Battery
Virginia Common Law
*Against Defendant Officers Murray, Yates, Holland, Cornett, Bower, Burke, Whitt, and Stumpf, in their individual and official capacities*

140. Mr. Chavis adopts and incorporates the above paragraphs as if fully set forth herein.

141. Defendant Altercation Officers knowingly and intentionally caused harmful and offensive contact with Mr. Chavis' person. Specifically, Defendant Altercation Officers intentionally slammed Mr. Chavis to the ground, crushed him with their body weight, and punched, crushed, and choked him.

142. Defendant Altercation Officers were aware that their contact with Mr. Chavis' person was unwanted and harmful as he persistently pleaded with them to stop and told them that he could not breathe.

21

143.    Defendant Altercation Officers knew that the level of force they were applying was unreasonable because Mr. Chavis was restrained and was complying with their orders throughout the entire interaction.

144.    Defendant Assisting Officers knowingly and intentionally caused harmful and offensive contact with Mr. Chavis' person when they crushed and punched him while he was restrained and defenseless.

145.    Defendant Assisting Officers were aware that crushing and punching Mr. Chavis' person was unwanted and harmful, and Mr. Chavis begged them to stop.

146.    Defendant Assisting Officers knew that the level of force they were applying was unreasonable because Mr. Chavis was restrained and not resisting throughout the entire interaction.

147.    Defendant Holland knowingly and intentionally caused harmful and offensive contact to Mr. Chavis' person by pepper spraying him directly in his eyes and face.

148.    Defendant Holland knew that pepper spraying Mr. Chavis' eyes and face was unwanted and harmful.

149.    Defendant Holland knew that the level of force he was applying was unreasonable because Mr. Chavis was restrained and not resisting throughout the entire interaction.

150.    Defendant Stumpf knowingly and intentionally caused harmful and offensive contact to Mr. Chavis by ordering his canine to bite Mr. Chavis' leg. Once the canine had bitten into Mr. Chavis' leg, Defendant Stumpf ordered it to continue biting him with commands of, "get him" and "get his ass."

151.    Defendant Stumpf knew that his contact with Mr. Chavis' person was unwanted and harmful as Mr. Chavis was already fully restrained and pleading, "please don't let that dog

22

bite me." As Defendant Stumpf's canine tore into Mr. Chavis' leg, Defendant Stumpf could hear Mr. Chavis cry out in pain, "y'all are killing me." Still, Defendant Stumpf failed to separate his canine from Mr. Chavis' leg or temper the severity of its attack on Mr. Chavis.

152. Defendant Stumpf knew that the level of force he applied was unreasonable because Mr. Chavis was fully restrained before he directed his canine to attack.

153. As a direct result of Defendant Officers' tortious conduct, Mr. Chavis suffered severe and permanent physical injuries and has endured emotional, mental, and psychological pain and suffering.

### Claim IV: Willful and Wanton Negligence
Virginia Common Law
*Against Defendant Officers Murray, Yates, Holland, Cornett, Bower, Burke, Whitt, and Stumpf, in their individual and official capacities*

154. Mr. Chavis adopts and incorporates the above paragraphs as if fully set forth herein.

155. Virginia and federal law impose upon Defendant Officers a duty to exercise reasonable care to protect Mr. Chavis' health and safety.

156. Defendant Altercation Officers breached their duty to exercise reasonable care when they placed their combined body weight on Mr. Chavis' head, back, and neck and forced him into a chokehold — staying in that position as other Defendant Officers escalated the attack — as well as when they crushed and punched him.

157. Defendant Altercation Officers acted in conscious disregard of Mr. Chavis' rights because they were aware that Mr. Chavis posed no threat to any of the five or more corrections officers or any other incarcerated person, was complying with their orders, could not breathe, and that their conduct would likely result in injury to him.

23

158.   Defendant Assisting Officers breached their duty to exercise reasonable care when they intentionally crushed and punched Mr. Chavis while he was already handcuffed, in a chokehold, and pinned under the weight of Altercation Officers.

159.   Defendant Assisting Officers acted in conscious disregard of Mr. Chavis' rights because they were aware that he was restrained under the weight of Altercation Officers, was complying with their orders and did not pose a threat to any corrections officer or any other incarcerated person, and that their conduct would likely result in injury to Mr. Chavis.

160.   Defendant Holland breached his duty to exercise reasonable care when he intentionally blasted pepper spray into Mr. Chavis' eyes and face.

161.   Defendant Holland knew that Mr. Chavis posed no threat to any corrections officer or incarcerated person while he was being slammed to the ground and not resisting.

162.   Defendant Holland acted in conscious disregard of Mr. Chavis' rights and with reckless indifference to the consequences of his conduct because he was aware that pepper spraying Mr. Chavis would likely cause injury to him.

163.   Defendant Stumpf breached his duty to exercise reasonable care when he used his canine to attack Mr. Chavis and continued to escalate the attack by encouraging his canine with commands of "get him" and "get his ass."

164.   Defendant Stumpf knew that Mr. Chavis posed no threat to any corrections officer or incarcerated person while he was handcuffed, face down on the floor, and not resisting.

165.   Defendant Stumpf acted in conscious disregard for Mr. Chavis' rights and with reckless indifference to the consequences of his conduct because he knew or should have known that ordering his canine to attack Mr. Chavis while he was unable to defend himself would likely cause injury to Mr. Chavis.

24

166.    Defendant Stumpf acted in conscious disregard for Mr. Chavis' rights and with reckless indifference to the consequences of his conduct because he knew or should have known that commanding his canine to "get him" and "get his ass" would likely cause his canine to inflict even greater injury on Mr. Chavis.

167.    As a direct and proximate result of the negligence of Defendant Officers, Mr. Chavis suffered severe and permanent physical pain and suffering, emotional pain and suffering, and persisting mental distress.

### Claim V: Intentional Infliction of Emotional Distress
Virginia Common Law
*Against Defendant Officers Murray, Yates, Holland, Cornett, Bower, Burke, Whitt and Stumpf, in their individual and official capacities*

168.    Mr. Chavis adopts and incorporates the above paragraphs as if fully set forth herein.

169.    Defendant Altercation Officers intentionally and recklessly caused Mr. Chavis to suffer severe emotional distress by violently slamming Mr. Chavis to the ground, suffocating him under their combined body weight, digging their knees into his head, back, and neck, forcing him into a chokehold, punching him, and trapping him helplessly in that position as other Defendant Officers escalated the attack.

170.    Defendant Altercation Officers' outrageous and intolerable conduct offends every standard of decency and morality as it was completely unjustified: Mr. Chavis complied with their orders and posed no threat to any other corrections officer or incarcerated person.

171.    Defendant Assisting Officers intentionally and recklessly caused Mr. Chavis to suffer severe emotional distress by intentionally crushing and punching him without cause while he laid helplessly on the ground under the weight of Altercation Officers.

172.    Defendant Assisting Officers' actions were unjustified as Mr. Chavis was complying with orders and did not pose a threat to any corrections officer or incarcerated person. The conduct of Defendant Assisting Officers was outrageous and intolerable and offends every standard of decency and morality.

173.    Defendant Cornett intentionally and recklessly caused Mr. Chavis to suffer emotional distress by mocking him with racial slurs and insults and sexually humiliating him. Defendant Cornett, as a trained law enforcement officer, knew or should have known that instructing Mr. Chavis, "spread your ass. Let me see that ass," during a strip search, coupled with the physical pain and humiliation of requiring Mr. Chavis to unnecessarily stand on his half eaten leg, squat, and expose himself to Defendant Cornett, would leave lasting emotional scars on him.

174.    By mocking Mr. Chavis with insults and racial slurs, and forcing Mr. Chavis to strip, squat, and expose himself, Defendant Cornett's actions were outrageous and intolerable and offend against every standard of decency and morality.

175.    Defendant Stumpf intentionally and recklessly caused Mr. Chavis to suffer severe emotional distress by ordering his canine to attack Mr. Chavis with full awareness that this could cause both physical and emotional harm. Defendant Stumpf, as a trained patrol canine officer, knew or should have known that purposely attacking Mr. Chavis with his canine would leave long-term emotional scarring on him. Even as Defendant Stumpf heard Mr. Chavis crying "you're killing me," he intentionally provoked the canine further despite knowing the obvious emotional trauma this would cause.

176.    By ordering his canine to attack Mr. Chavis, who did not pose a threat to any corrections officer or incarcerated person, and who was complying with orders, Defendant Stumpf's outrageous and intolerable conduct offends every standard of decency and morality.

26

Defendant Stumpf continued to offend every standard of decency and morality by encouraging his canine to tear even further into Mr. Chavis' leg as he laid helplessly on the ground and pleading in agony.

177. The emotional distress that Mr. Chavis suffers as a direct result of Defendant Officers' actions is severe. Mr. Chavis' persistent emotional trauma prevents him from sleeping through most nights as he is forced awake in cold sweats if he hears the bark of canines or loud noises. When Mr. Chavis can sleep, he is forced to relive the night of the attack through vivid nightmares and night terrors. For a year following the attack, Mr. Chavis' emotional trauma forced him to constantly fear losing the use of his legs.

### Claim VI: Retaliation in Violation of the First Amendment
U.S. Const. Amend. I; 42 U.S.C. § 1983
*Against Defendant Officer Yates, in his individual and official capacity*

178. Mr. Chavis adopts and incorporates the above paragraphs as if fully set forth herein.

179. On July 23, 2023, immediately following the incident, Mr. Chavis engaged in a protected First Amendment activity by stating his intent to file a lawsuit against certain Defendant Officers, including Defendant Yates.

180. On or around July 29, 2023, Mr. Chavis was subject to a disciplinary charge based on Defendant Yates accusing Mr. Chavis of actions he knew to be false — namely, that Mr. Chavis bit Defendant Yates.

181. The disciplinary charge is false because Mr. Chavis did not bite Defendant Yates.

182. Due to the temporal proximity being a matter of days between the stating of his intent to file a lawsuit and the disciplinary charges, the false charges were brought against Mr. Chavis in retaliation for expressing intent to sue after the attack.

## VI. DAMAGES

Plaintiff, Jaeon Chavis, has suffered the following injuries for which he seeks full compensation under the law:

1) Significant physical injuries and permanent nerve damage, which has left Mr. Chavis without the full usage of his limbs, resulting from Defendants attacking him and ordering a canine to bite him;

2) Recurring pain and suffering;

3) Lasting mental and emotional distress.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks that the Court:

DECLARE that Defendants' conduct violated the First and Eighth Amendments to the United States Constitution, and Virginia common law through the torts of assault, battery, willful and wanton negligence, and intentional infliction of emotional distress;

ENTER JUDGMENT holding the appropriate Defendants jointly and severally liable to Plaintiff for all relief available under 42 U.S.C. § 1983;

AWARD JUDGMENT holding the appropriate Defendants jointly and severally liable to Plaintiff for compensatory damages, punitive damages and other damages recoverable under the laws of the Commonwealth of Virginia;

AWARD Plaintiff his costs and reasonable attorney's fees; and

GRANT such other and further relief as the Court deems just and proper.

Dated: April 17, 2025

Respectfully submitted,

/s/Aderson Francois

Aderson Francois (DC Bar No. 498544)
(*pro hac vice*)
Alexander Afnan (DC Bar No. 1742388)
(*pro hac vice*)
Nicole Rheault (DC Bar No. 1780028)
(*pro hac vice*)
Civil Rights Clinic
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 352
Washington, DC 20001
(202) 662-6721
aderson.francois@georgetown.edu

/s/ Joshua Erlich

Joshua Erlich (VSB No. 81298)
The Erlich Law Office PLLC
1550 Wilson Boulevard, Suite 700
Arlington, VA 22209
Tel: (703) 791-9087
Fax: (703) 722-8114
jerlich@erlichlawofice.com

*Counsel for Plaintiff*